UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOEL HELFMAN,

    Plaintiff,

vs                                                     Case No: 06-13528
                                                     Honorable Victoria A. Roberts

GE GROUP LIFE ASSURANCE COMPANY,
GENWORTH LIFE AND HEALTH INSURANCE COMPANY,
and SUN LIFE ASSURANCE COMPANY OF CANADA

    Defendants.
_____/

## OPINION AND ORDER

**I.    Introduction**

    **A.    Motions**

Four interrelated motions are before the Court:

1.    Defendant Genworth's Motion for Entry of Judgment;

2.    Defendant Sun Life's Motion for Entry of Judgment;

3.    Plaintiff Helfman's Cross-Motion for Entry of Judgment (Against Genworth); and

4.    Plaintiff Helfman's Cross-Motion for Entry of Judgment (Against Sun Life).

1

## II. Background

### A. Filmore and Fairway

Plaintiff Joel Helfman worked at two family owned companies: Atlas Filmore Lumber Company, which also does business as Filmore Construction Company, and Fairway Construction Company.

These separate companies, Filmore and Fairway, have different Michigan Corporate Entity ID numbers. However, they share the same address and phone number, as well as the same DUNS number for government contract work. Helfman owns 50% of Filmore. He once owned stock in Fairway, but, in 1990, transferred all of it to his wife for tax reasons. He has variously listed his title as Secretary-Treasurer, Executive or Manager of Sales Staff. His brother, David Helfman, serves as President of Filmore.

### B. Genworth and Sun Life

In this lawsuit, Helfman sues two insurance companies: Genworth, formerly known as GE Group Life, and Sun Life.

In June 2002, Fairway applied for and Genworth issued a Group Long-Term Disability Insurance Policy. Fairway submitted an employee census for coverage; the census included Helfman's name. Helfman asked that Genworth accept a W2 from Filmore for its Fairway insurance, as Filmore paid his salary for tax reasons, even though he worked for Fairway. Genworth accommodated, relying on Helfman's Filmore income to provide coverage to him through Fairway.

A year later, in June 2003, Filmore applied for and Sun Life issued a Group Long-Term Disability Insurance Policy. Filmore submitted an employee census for coverage; once again, the census included Helfman's name.

Even though Genworth insured Fairway, Filmore paid Helfman's premiums to both Genworth and Sun Life. Helfman reimbursed Filmore through his general ledger account. As evidence of his reimbursements, Helfman offers an "Account Analsis [sic]" spreadsheet, David Helfman's (Joel Helfman's brother) affidavit and the deposition of the Filmore's Controller, John Slemer.

C. **Disability Begins**

On December 26, 2003, Helfman suffered a heart attack. Three days later, he underwent quadruple bypass surgery. He filed his disability insurance claims with both Genworth and Sun Life in early January 2004.

Both Genworth and Sun Life paid Short Term Disability benefits, and later, began paying Long Term Disability (LTD) benefits.

In January 2005, while processing Helfman's LTD claim, Sun Life learned Helfman also received benefits from Genworth through the policy issued to Fairway. Sun Life contacted Genworth and Genworth investigated, discovering that while it paid Helfman benefits because of his Fairway insurance, Sun Life paid him benefits because of his Filmore insurance. Genworth relayed its discoveries to Sun Life. Sun Life revealed that it paid Helfman based on a W2 from Filmore, just as Genworth paid Helfman based on a W2 from Filmore. Genworth stopped making payments to Helfman on March 30, 2005. Sun Life followed. Both requested Helfman reimburse them for

3

payments they made while he received income from the other.

### D. Benefits Cease

Genworth stopped paying benefits because of Helfman's "other income" from the Sun Life policy, which it alleged Helfman never revealed to it. Specifically, Genworth's Insurance Certificate defines "Other Income" as "any other group insurance plan."

Sun Life stopped paying benefits because it determined that Helfman's disability had ended. Its own experts, after analyzing Helfman's file, found Helfman capable of returning to work. Even though Helfman's own doctor, Dr. Silverman, cited stress related to the work environment as the factor leading him to recommend against Helfman returning to work, he acknowledged that "most of Mr. Helfman's issues regarding returning to work are subjective."

### E. Administrative Remedies Exhausted

Helfman retained counsel and pursued administrative remedies. His first counsel, later dismissed in favor of his current counsel, sent a request to Sun Life specifically reserving the right to pursue all ERISA remedies. Sun Life acted upon this request by having a surgeon, a cardiologist, and an occupational rehabilitation consultant review Helfman's entire claim file. All found Helfman medically sound to return to work and Sun Life let Helfman know that it would not continue benefits. Sun Life reiterated its request for reimbursement.

Helfman's predecessor counsel also filed an administrative appeal with Genworth. Genworth requested documents from Helfman and investigated. After its investigation, Genworth did not change its decision to end benefits. Declaring the

4

record closed, Genworth reiterated its request for reimbursement.

With administrative remedies exhausted, Helfman sued.

### III. The Parties' Arguments

#### A. Helfman's Arguments

Helfman argues that ERISA does not govern, and more specifically that ERISA does not apply to him, even though it applies to other employees under the same plan. He argues that he meets the safe harbor regulations of 29 C.F.R. § 2510.3-1. He says that the plans meet all of the factors, except the first factor, because all other employees, except three, had their premiums paid by their employer. He argues because he reimbursed Filmore for his premiums, he meets the first factor, and with it, all four factors of the safe harbor regulations. He urges the Court to split the plans and consider them as hybrids, with himself not governed by ERISA. He sees this "split-plan" question as a matter of first impression before the Court. In the alternative, he argues that both Genworth's and Sun Life's actions qualified as "arbitrary and capricious."

Helfman seeks: reinstatement of his benefits; back pay of benefits, with interest, for the duration since Genworth and Sun Life ceased paying them; and, attorney's fees.

#### B. Genworth's Arguments

Genworth argues that ERISA does apply. It argues that the safe harbor regulations do not apply because splitting a plan as Helfman proposes goes against *Yates v. Hendon*, 541 U.S. 1 (2004). *Yates* held that excepting an owner "from ERISA's coverage is hardly consistent with the statutory goal of "uniform national treatment of pension benefits," *Patterson v. Shumate*, 504 U.S. 753, 765, 112 S.Ct. 2242, 119

L.Ed.2d 519, and would generate administrative difficulties." *Yates* at 3-4. In the alternative, even if the safe harbor regulations apply, Genworth argues that Helfman does not meet the first factor, because it finds Helfman's proofs of his reimbursement of his premiums unconvincing. If ERISA applies, Genworth argues it did not act in an "arbitrary and capricious" manner.

Genworth seeks: reimbursement of all of its benefits, $107,1333.33; and, dismissal of Helfman's claim.

### C. Sun Life's Arguments

Sun Life advances arguments similar to Genworth's, also citing *Yates* to argue that the safe harbor regulations should not apply. Sun Life further cites *Shaw v. Delta Air Lines*, 463 U.S. 85, 99 (1983), arguing that Helfman's "split-plan" would create "mutually exclusive pockets of federal and state jurisdiction," contrary to the Supreme Court's view of ERISA's statutory goal. In the alternative, even if the safe harbor regulations apply, Sun Life argues that Helfman does not meet any of the four factors. If ERISA applies, Sun Life argues it did not act in an "arbitrary and capricious" manner.

Sun Life seeks: reimbursement of nearly all of its benefits, $94,844.54; and, dismissal of Helfman's claim.

## IV. Applicable Law

### A. Overview

The Court must first determine whether ERISA applies. If ERISA does not apply, then the matter involves strictly state law claims.

If ERISA does apply, then the Court must apply the "arbitrary and capricious"

standard, because both the Genworth and Sun Life plans gave their administrators "discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. V. Bruch*, 489 U.S. 101, 115 (1989).

If no "arbitrary and capricious" actions occurred, the Court must determine whether each of the insurance companies can obtain repayment of any overpaid benefits.

### B.     Three Steps to Determine Whether ERISA Applies

To determine whether a plan qualifies as an ERISA plan, the Court must undertake a three-step factual inquiry. *Thompson v. American Home Assurance Co.*, 95 F. 3d 429, 434 (6th Cir. 1996).

> First, the court must apply the so-called "safe harbor" regulations established by the Department of Labor to determine whether the program was exempt from ERISA.
> Second, the court must look to see if there was a "plan" by inquiring whether "from the surrounding circumstances a reasonable person [could] ascertain the intended benefits, the class of beneficiaries, the source of financing, and procedures for receiving benefits."
> Finally, the court must ask whether the employer "established or maintained" the plan with the intent of providing benefits to its employees."

*Id.* (citations omitted).

> The Department of Labor safe harbor regulations state:
> For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance program offered by an insurer to employees or members of an employee organization, under which
> (1) No contributions are made by an employer or employee organization;
> (2) Participation [in] the program is completely voluntary for employees or members;
> (3) The sole functions of the employer or employee organization with respect to the program are, without endorsing the program, to permit the insurer to publicize

> the program to employees or members, to collect premiums through payroll deductions or dues checkoffs and to remit them to the insurer; and
> (4) The employer or employee organization receives no consideration in the form of cash or otherwise in connection with the program, other than reasonable compensation, excluding any profit, for administrative services actually rendered in connection with payroll deductions or dues checkoffs.

29 C.F.R. § 2510.3-1(j).

For a court to exempt a policy from ERISA, the policy must satisfy all four safe harbor factors. The failure of any factor renders the safe harbor inapplicable. *Thompson* at 435.

### C. "Arbitrary and Capricious" Standard

If a Court finds ERISA applies, then it must evaluate the plan administrator's actions under the "arbitrary and capricious" standard. This requires the Court to uphold the benefit determination if the plan administrator offers a reasoned explanation based on the evidence. *Univ. Hospitals of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 (6th Cir. 2000).

In reviewing the benefit determination, the Court may only consider the same evidence as the plan administrator considered. *Wilkins v. Baptist Healthcare Sys., Inc.*, 150 F.3d 609, 614-15 (6th Cir. 1998); *Perry v. Simplicity Eng'g*, 900 F.2d 963, 966 (6th Cir. 1990). The Court must determine whether the administrator "made a correct decision." *Perry*, 900 F.2d at 966. However, "[t]he administrator's decision is accorded no deference or presumption of correctness." *Hoover v. Provident Life & Accident Ins. Co.*, 290 F.3d 801, 809 (6th Cir. 2002) (citing *Perry*, 900 F.2d at 966). "[T]he court must determine whether the administrator properly interpreted the plan and whether the insured was entitled to benefits under the plan." *Id.*

Financial conflict of interest does not alter this standard, unless "significant evidence" of financial motivation exists. *Osborne v. Hartford Life & Acc. Ins. Co.*, 465 F.3d 296, 300 (6th Cir., 2006).

**D.     Repayment**

Under ERISA, "a fiduciary may bring a civil action under § 502(a)(3)(B) "to obtain ... appropriate equitable relief . . . to enforce . . . the terms of the plan.""  *Sereboff v. Mid Atlantic Medical Services, Inc.* 547 U.S. 356, 356, 126 S.Ct. 1869, 1870 (U.S.,2006). Restitution qualifies as "equitable relief."  *Allinder v. Inter-City Products Corp. (USA).* 152 F.3d 544, 552 (C.A.6 (Tenn.),1998) (citing *Mertens v. Hewitt Assoc.*, 508 U.S. 248, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993)).  Further, "[f]or restitution to lie in equity, the action generally must seek not to impose personal liability on the defendant, but to restore to the plaintiff particular funds or property in the defendant's possession." *Great-West Life & Annuity Ins. Co. v. Knudson.* 534 U.S. 204, 205, 122 S.Ct. 708, 710 (U.S.,2002)

**V.     Analysis**

**A.     Does ERISA Apply?**

Even though Helfman admits other employees had their premiums paid in full by Filmore, he contends that the Court should split him off from the jurisdiction of ERISA. This argument is unavailing.  The regulations speak clearly on this point: "For purposes of Title I of the Act and this chapter, the terms "employee welfare benefit plan" and "welfare plan" shall not include a group or group-type insurance *program* offered by an insurer to employees or members of an employee organization . . ."  29 C.F.R. §

9

2510.3-1 (emphasis added).  In other words, the safe harbor regulations apply to *programs* not *persons*.

This case involves two programs.  The first, established in June 2002, involved Genworth and Fairway.  The second, established in June 2003, involved Sun Life and Filmore.  In their submitted employee censuses for coverage, both Filmore and Fairway listed Helfman as an employee.  In these programs, Filmore and Fairway paid employees' premiums, except where the employees reimbursed.

But the safe harbor regulations apply to the entire program, not individually to each person within it.  By reimbursing his premium, Helfman did not remove himself from the group long term disability programs that he had enrolled in.  He did not split off from the plan into an individual plan.  He remained a member of both group long term disability programs.

Because the safe harbor regulations clearly state they apply to *programs*, and not to *persons*, Helfman cannot meet the safe harbor factors; Helfman does not qualify as a program.  The programs either meet or do not meet the safe harbor factors.

Furthermore, in *Yates*, the Supreme Court found that not splitting a plan "avoids the anomaly that the same plan will be controlled by discrete regimes: federal-law governance for the nonowner employees; state-law governance for the working owner." *Yates* at 3.  This principle applies here as well.  Splitting apart the plan — by finding the safe harbor exception applies to Helfman, who reimbursed his premium, but not to the majority of employees in the plan, whose employer paid their premiums — would create an anomaly where the same plan would fall under discrete regimes.  Such disparate

10

"coverage is hardly consistent with [ERISA's] statutory goal of "uniform national treatment of pension benefits"." *Yates* at 4 (quoting *Patterson v. Shumate*, 504 U.S. 753, 765).

If Helfman had wanted ERISA not to apply, he should have either enrolled in an individual disability plan, where he paid his own premiums, or enrolled in a separate group disability plan where all of the participants paid their own premiums.

### B. Termination of Benefits: Was Genworth "Arbitrary and Capricious"?

Genworth's Plan defines "Other Income" as "any other group insurance plan." Genworth's coverage ceased when it determined Helfman received undisclosed "Other Income," namely Sun Life's payments.

The Court upholds Genworth's termination of benefits, based on Helfman's eligibility for Sun Life's coverage, because Genworth acted "rational[ly] in light of the Plan's provisions." *See Univ. Hospitals of Cleveland*, 202 F.3d at 846 (citation omitted).

### C. Termination of Benefits: Was Sun Life "Arbitrary and Capricious"?

Sun Life terminated payments because it determined Helfman lacked a continuing disability. Sun Life arrived at this determination after its experts reviewed Helfman's medical history and claim file. After extensive analysis, the experts found that Helfman's disability had ended.

The Court upholds Sun Life's termination of benefits, based on Helfman's lack of a continuing disability. Sun Life acted "rational[ly] in light of the Plan's provisions." *See Univ. Hospitals of Cleveland*, 202 F.3d at 846 (citation omitted).

### D. Repayment to Genworth

Helfman owes Genworth all payments it made to him, $107,133.33, less Helfman's premiums, since Genworth made the payments to Fairway during Helfman's period of ineligibility because of unreported "Other Income" from Sun Life to Helfman via the Filmore plan. Genworth does not owe Helfman anything, as it rationally terminated Helfman's disability payments once it determined Helfman had violated its policy. Furthermore, Helfman signed an agreement with Genworth agreeing to repay overpayments.

In *Gilchrest v. Unum Life Insurance Company of America*, 225 Fed. Appx. 38, 2007 WL 3037329 (6th Cir. 2007), the Sixth Circuit interpreted *Sereboff*, finding "the [Supreme] Court clarified that to establish an equitable lien by agreement, strict tracing is not required and the fund need not have been in existence when the contract was executed." *Gilchrest* at 6-7.

ERISA allows this repayment, as a form of equitable relief. Genworth does not seek to impose personal liability on Helfman, but rather seeks to restore to itself the particular funds — overpaid benefits — currently in Helfman's possession.

**E.     Repayment to Sun Life**

Sun Life seeks reimbursements from Helfman because of Genworth's payments to him. Sun Life's Plan defined "Other Income" as "any other group insurance plan of the *Employer*." (emphasis added). Filmore acted as Helfman's Employer for the purposes of Sun Life's plan. Fairway, Helfman's other employer, did not fall under the terms of Sun Life's plan, which only specified group insurance plans of "the Employer," defined to be Filmore. Sun Life's own plan, in its definitions section, says: "Employer

12

means Atlas Filmore Lumber Company, d.b.a. Filmore Construction Company and includes any Subsidiary or Affiliated company named in the Application." Because the Application never named Fairway, Fairway cannot qualify as a "Subsidiary or Affiliated company named in the Application." The fact that Filmore paid Helfman's salary at Fairway does not make both Filmore and Fairway "the Employer" for purposes of Sun Life's plan when Sun Life's plan's own definition specifies only Filmore.

Helfman does not owe Sun Life; Sun Life's plan's definition of "Other Income" restricts itself to "any other group insurance plan of the Employer." That clause does not encompass Genworth's payments to Helfman via the Fairway plan.

## VI. Conclusion

The Court **GRANTS** Defendant Genworth's motion and **GRANTS** in part and **DENIES** in part Defendant Sun Life's motion. The Court **GRANTS** in part and **DENIES** in part Plaintiff Helfman's cross-motion.

Plaintiff recovers nothing against either Defendant. On its counterclaim, Genworth is entitled to recover its overpayment from Plaintiff in the amount of $107,133.33, less an amount corresponding to Helfman's premiums. Sun Life collects nothing on its counterclaim.

Judgment to enter accordingly.

**IT IS ORDERED**.

                                                     S/Victoria A. Roberts
                                                    Victoria A. Roberts
                                                    United States District Judge

Dated: August 8, 2008

The undersigned certifies that a copy of this document was served on the attorneys of record by electronic means or U.S. Mail on August 8, 2008.

s/Carol A. Pinegar
Deputy Clerk